UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CITIZENS FOR RATIONAL COASTAL DEVELOPMENT, | : | |
| Plaintiff, | : | Civil Action No. 07-4551 (JAP) |
| v. | : | |
| U.S. FEDERAL HIGHWAY ADMINISTRATION, *et al.* | : | |
| Defendant. | : | |
| BOROUGH OF SEA BRIGHT, | : | |
| Plaintiff, | : | Civil Action No. 07-5246 (JAP) |
| v. | : | |
| J. RICHARD CAPKA, SECRETARY OF TRANSPORTATION, *et al.*, | : | **OPINION** |
| Defendant. | : | |

PISANO, District Judge

Plaintiffs, Citizens for Rational Coastal Development ("CRCD") and the Borough of Sea Bright ("Sea Bright," collectively with CRCD, "Plaintiffs") brought these actions against the Federal Highway Administration, the Secretary of Transportation, J. Richard Capka, the New Jersey Department of Transportation, and the New Jersey Department of Environmental Protection (collectively, "Defendants") seeking to enjoin an ongoing transportation project that

will replace an existing movable bridge (*i.e.*, drawbridge) on New Jersey State Route 36 (the "Route 36 Bridge") with a higher, fixed-span bridge. Presently before the Court is a "joint motion" by Plaintiffs for a preliminary injunction directing defendants to "refrain from any further planning, acquisition of right-of-way, financing, awarding of bids, contracting, or construction of the proposed action until Defendants have fully complied with section 4(f) of the [Department of Transportation] Act [49 U.S.C. § 303]." Moving Brf. at 1-2. The Court heard oral argument on the motion on January 28, 2008, and February 4, 2008. As set forth below, because the Plaintiffs have failed to establish that they are entitled to preliminary injunctive relief, their motion is denied.

**I.  Background**

A.  The Route 36 Bridge

The Route 36 Bridge extends over the Shrewsbury River near Sandy Hook Bay and connects Highlands Borough on the mainland with certain shoreline towns such as Sea Bright. It has four lanes (two lanes in each direction) and two sidewalks. The bridge is a double leaf bascule[1] structure, which means that it consists of two leaves that can be opened to allow marine traffic to pass underneath. With a vertical clearance of 35 feet when closed, the bridge must be opened in order for sailboats and other marine vessels to pass through.

The bridge is considered historic in nature, being designed in 1931 "by the noted engineering firm of Wadell & Hardesty," Def. Ex. 17 at 1, and was built in the years 1932-33. In 1991, the New Jersey State Historic Preservation Office ("SHPO") found that the bridge was

---

[1] The American Heritage Dictionary defines a bascule as a "device or structure, such as a drawbridge, counterbalanced so that when one end is lowered the other is raised."

eligible for listing on the National Register of Historic Places, stating that the bridge "is an exceptionally well-preserved and beautifully situated example of early 20th century movable bridge technology." Def. Ex. 17 at 1. Additionally, there are several historic sites located in the area of the bridge. These include, but certainly are not limited to, the Twin Lights Historic Site (Navesink Lighthouse), Fort Hancock and the Sandy Hook Proving Ground Historic District. Def. Ex. 30.

According to Defendants, the Route 36 Bridge is approaching the end of its 75-year estimated service life and has been classified by the New Jersey Department of Transportation ("NJDOT") as "Structurally Deficient and Functionally Obsolete" based on federal standards. Def. Ex. 56, at ¶ 2. As noted by Richard Dunne, NJDOT's Executive Manager and Deputy State Transportation Engineer,

> the bridge and its approaches contain substandard geometric features including lanes that are too narrow, radii on the approach ramps that are too small, poor skid resistance on the bascule (drawbridge) section, inadequate railings, and lack of shoulders and median barriers. The existing piles and foundations, and the existing high-rocker type expansion bearings and relatively narrow piler caps, similarly do not comply with modern seismic criteria specifications. These features would not provide adequate protection in the event of a seismic event, such as an earthquake. These antiquated features make the existing bridge significantly less safe than a modern bridge meeting all current safety standards.

*Id.* at ¶ 3. *See also* Declaration of Thomas Everett, Def. Ex. 57, at ¶¶ 10, 11 ("several bridge components are already in an advanced state of deterioration. . . [c]ontinued rapid deterioration of the condition of the bridge is expected to occur."). Because of the ongoing deterioration of the bridge, its load carrying capacity is steadily decreasing and the bridge will eventually reach a point where it cannot carry normal traffic loads. *Id.* at ¶ 8. As a result on the continued deterioration, the bridge is subject to frequent inspections. NJDOT has scheduled inspections of

3

the bridge every three months while, typically, bridges are inspected every two years. *Id.*

During the busy summer month at the New Jersey shore, frequent openings of the Route 36 Bridge cause traffic delays for motorists. As discussed further below, it has been noted that such delays are particularly unacceptable in times of emergency, because the bridge is used by emergency services, *e.g.*, ambulance and fire department, and it is also part of the planned coastal evacuation route for the residents of the area. *See*, *e.g.*, Def. Ex. 15 at 19. As a result of the deficiencies with the existing bridge as well as these traffic issues, a project is presently underway to replace the existing Route 36 Bridge with a new, high-level fixed bridge.

B.  History of the Proposed Replacement of Existing Route 36 Bridge

The record in this case is extensive and goes back approximately 20 years.[2] It shows that as early as the 1980's, the State of New Jersey began seeking federal funds under the Federal-Aid Highway Act, 23 U.S.C. § 101, *et seq.*, in order to undertake environmental and design studies for the rehabilitation or replacement of the Route 36 Bridge. The amount of federal funds authorized for these studies, to date, totals over $14 million.

At first, a major rehabilitation to the existing bridge was proposed at an estimated cost, in 1991, of $19.3 million. *See* Def. Ex. 1-7, 11. Such work would have included replacing the concrete approach spans, replacing the deck and widening the flanking and bascule spans, upgrading the electrical and mechanical systems, and making improvements in the bridge and approach roadway. Def. Ex. 11 (Value Engineering Evaluation, October 1991).

Around this same time, on June 6, 1991, the SHPO determined that the Route 36 Bridge

---

[2]The Court notes that the entire administrative record in this case has not yet been filed, but the parties have provided a substantial portion of the record to the Court for the purposes of this motion.

was eligible for listing on the National Register of Historic Places. Def. Ex. 8, 17. At that time, however, a determination could not be made by SHPO as to the effects of the proposed rehabilitation on the historic nature of the bridge. Def. Ex. 7 at 6. After more information was provided to SHPO, the organization concluded that the proposed rehabilitation work was such that it would constitute an "adverse effect" on the historical nature of the structure. *Id.*

In 1991, a Value Engineering Evaluation compared the proposed rehabilitation with the alternative of replacing the existing bridge with a high level bridge. Replacement of the bridge was intended to address the deficiencies in the existing bridge as well as the traffic problems caused by numerous bridge openings. Def. Ex. 11 at 10. The report concluded that the expenditure of $19.3 million for the proposed rehabilitation may not be cost effective when, for a comparable cost, the bridge could be replaced with a structure that would have a significantly longer service life, provides better service for traffic and provide major safety improvements. *Id.* at 4-5. Taking into account the projected service life, operational costs and construction costs, the report found that replacement of the existing bridge rather than the proposed rehabilitation resulted in a savings of over $21 million, and the report recommended replacement as the preferable alternative. *Id.* at 9. Upon review of the Value Engineering Evaluation in December 1991, the Federal Highway Administration ("FHWA") generally "concur[red] with the concept of constructing a high level structure at this location." Def. Ex. 12.

Over the course of the next decade, several studies were prepared to evaluate the available alternatives for rehabilitation or replacement of the Route 36 Bridge. These included the "Historic Bridge Alternatives Analysis" in November 1996, (Def. Ex. 13); "Optimum Height Analysis" in July 1998, (Def. Ex. 14); and "Feasibility Studies: Evaluation of Alternatives" in

5

December 1999 (Def. Ex. 15).

The 1999 study considered five alternatives in addition to the alternative of "no build" (*i.e.*, doing nothing except routine maintenance): (1) minor rehabilitation; (2) major rehabilitation; (3) new bridge on new alignment; (4) replacement on line: high-level (55'-65'+) fixed bridge; and (5) replacement on line: high-level (55' to 65') movable bridge. At that time, because the Coast Guard took the position that the structure must accommodate vessels in excess of 65' high (a position which the Coast Guard later changed), NJDOT chose the last alternative, *i.e.*, replacement online with a high-level movable bridge. This was the only alternative that met all of the project needs that were identified in the report. These project needs included maintaining "system linkage" (*i.e.*, maintaining this link in Route 36 as a coastal evacuation and emergency services route), increasing safety on the bridge, minimizing conflicts between vehicular and marine traffic (*i.e.*, minimizing bridge openings), remedying structural deficiencies, minimizing operating costs, and meeting Coast Guard requirements. According to Defendants, the 1999 analysis was reviewed by the FHWA and the agency requested further studies.

Consequently, a "Feasibility Assessment Report" was completed in June 2003. Def. Ex. 21. This analysis considered four alternatives in addition to the "no build" option: (1) minor rehabilitation; (2) major rehabilitation; (3) new movable bridge on new alignment; and (4) new high-level fixed bridge. This study recommended that last alternative, under which the existing bridge would be demolished and replaced with a 65' high fixed bridge on a slightly different alignment than the original (by this time the Coast Guard had changed its position with respect to the minimum acceptable height of a fixed bridge). This alternative most fully addressed the issues of disruptions to emergency services, safety on the bridge, vehicular and marine traffic

6

conflicts, structural deficiencies, and operating costs, and it met all Coast Guard requirements. However, the report noted that some key issues and problems would need to be addressed in order to implement this alternative. Among these were gaining acceptance through community outreach, obtaining the appropriate permits, and mitigating historical impact through design considerations in order to obtain SHPO approval of the new design. A decision was made to proceed with the recommended alternative of replacing the Route 36 Bridge, and the state undertook efforts to address the issues identified in order to implement the plan.

    NJDOT has engaged in community outreach regarding the project for many years. Declaration of Pankesh Patel, Def. Ex. 59 at ¶¶ 2, 4, 5; Def. Ex. 24, 63-64. As a result, the Borough of Highlands and plaintiff Sea Bright passed resolutions supporting the proposed replacement bridge and entered into utility agreements with NJDOT. Def. Ex. 65 (February 2, 2005 Resolution by Borough of Highlands approving bridge replacement project), Def. Ex. 66 (March 15, 2005 Resolution by Sea Bright approving bridge replacement project), Def. Ex. 68 (May 17, 2005 Resolution by Sea Bright authorizing entry into utility agreement), Def. Ex. 69 (July 20, 2005 Resolution by Borough of Highlands authorizing entry into utility agreement).

    In addition to community outreach, NJDOT consulted with the appropriate agencies for the necessary approvals and permits. The state consulted with and/or obtained the necessary approvals and permits for the bridge replacement from the Coast Guard, Def. Ex. 41, 48-50, the United States Army Corps of Engineers, Def. Ex. 46, the National Park Service, Def. Ex. 18, 19, 22, the United States Fish and Wildlife Service, Def. Ex. 38, and the FHWA, Def. Ex. 33.

    With respect to historical issues, NJDOT and FHWA engaged in extensive consultation with SHPO, the Advisory Council on Historic Preservation, and the National Park Service with

7

respect to the National Historic Preservation Act ("NHPA") Section 106, and Federal-Aid Highway Act ("FAHA") Section 4(f) .  Def. Ex. 23, 25-31, 51.  On August 30, 2005, a memorandum of agreement ("MOA") was executed and approved by FHWA, the National Park Service, the New Jersey Department of Environmental Protection ("NJDEP"), and NJDOT, resolving the Section 106 issues and addressing how the project would be carried out to mitigate the historical impact (*e.g.*, historic features of the bridge would be used as a guide to design the features of the new bridge, appropriate decorative elements would be salvaged).  Def. Ex. 32.  With respect to Section 4(f), the FHWA and the NJDOT issued a Nationwide Programmatic Section 4(f) Evaluation in July 2005, concluding that there was no prudent and feasible alternative to the use (demolition) of the existing Route 36 Bridge.  Def. Ex. 86.  This programmatic evaluation and its conclusions are of particular significance to the instant motion, as will be discussed below.

On May 25, 2007, after extensive consultation between NJDOT and NJDEP[3] as to the remaining historical impact issues under state law, SHPO approved NJDOT's application for the project.  *See* Def. Ex. 40.  Plaintiffs in this case each have appealed this May 25, 2007 decision in the state courts.  *See Citizens for Rational Coastal Development v. NJDEP*, Docket A-005678-06TS, Superior Court of New Jersey, Appellate Division (Def. Ex. 42, 44); *Borough of Sea Bright v. NJDEP*, Docket A-005669-06-T2, Superior Court of New Jersey, Appellate Division (Def. Ex. 43, 45).  These cases are presently pending.

---

[3]The New Jersey's Historic Preservation Office is located within the state's Department of Environmental Protection.

C.  Procedural History

Plaintiff CRCD filed its complaint on September 21, 2007, against the FHWA, NJDOT, and the NJDEP seeking judicial review under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 to 706 and alleging violations of the following: (i) Section 106 of the National Historic Preservation Act; (ii) Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303; (iii) the National Environmental Policy Act, 42 U.S.C.§ 1421, *et seq*.; and (iv) the public hearing requirement of 49 U.S.C. § 5323(b).  CRCD also alleges that Section 4(f) is inconsistent with the National Environmental Policy Act and should be invalidated.

The Borough of Sea Bright filed its complaint on October 31, 2007, against the Secretary of Transportation, J. Richard Capka, and the FHWA seeking judicial review under the APA, 5 U.S.C. § 706(2)(A) and alleging violations of the following: (i) National Environmental Policy Act; (ii) Section 4(f) of the Department of Transportation Act; and (iii) the FHWA's "Movable Bridge Policy" embodied in 23 C.F.R. 650.809.

Although initially proceeding as two separate actions, the Plaintiffs filed the instant motion in each action as a "joint" motion for preliminary injunctive relief on December 19, 2007. The Court consolidated both civil actions for all purposes on January 28, 2008.

**II.  Discussion**

A.  Standard for Preliminary Injunctive Relief

In evaluating a motion for preliminary injunctive relief, a court must consider whether: "'(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'"  *NutraSweet Co. v. Vit-Mar Enterprises,*

*Inc.*, 176 F.3d 151, 153 (3d Cir.1999) (quoting *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir.1998)).  A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Masurek v. Armstrong*, 520 U.S. 968, 972 (1997). Preliminary injunctive relief is an "extraordinary and drastic remedy", *id.*, which "should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.1994). [4]

B.  Plaintiffs Have Failed to Establish a Likelihood of Success on the Merits

Although Plaintiffs' complaints raise several different claims, they bring this motion for preliminary injunctive relief only with respect to their claims that Defendants violated the Department of Transportation Act, Section 4(f), 49 U.S.C. § 303.  Section 4(f) provides in the relevant part as follows:

> [T]he Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if--
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

---

[4] Some recent district court decisions have noted that The Third Circuit has not settled whether all four factors must be balanced in each case, or whether a failure to satisfy the first two factors obviates the need to examine the last two factors. *See Quaker Chem. Corp. v. Varga*, 509 F.Supp.2d 469, 478 n. 7 (E.D. Pa. 2007); *Brown v. Diguglielmo*, 2007 WL 4570717, *1 (E.D. Pa. 2007).

49 U.S.C. § 303.  Thus, under § 4(f), the Secretary of Transportation may approve a transportation program or project requiring the use of an historic site only if (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the historic site resulting from the use.  49 U.S.C. § 303.  "In a Section 4(f) challenge, the plaintiff bears the burden of showing by a preponderance of the evidence that the Secretary acted improperly in approving the use of protected property." *See Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 694 (3d Cir. 1999).

In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 401 (1971), the Supreme Court considered the mandate under Section 4(f) and set the standard for judicial review in such matters.  The Court noted that § 4(f) contains "clear and specific directives" that the Secretary "shall not approve any program or project" that requires the use of a historical site unless the two statutory criteria are met.  The Court stated that an alternative is "feasible" within the meaning of this provision unless its use would be contrary to "sound engineering." 401 U.S. at 411.  It further held that an alternative is "prudent" within the meaning of this provision unless its use involved "truly unusual factors" or its use involved "cost or community disruption ... [of] extraordinary magnitudes." 401 U.S. at 413.

*Overton Park* sets forth a three-part test to be used for APA judicial review of a Section 4(f) claim.  First, the reviewing court must determine whether the decision maker "acted within the scope of his authority."  In making this inquiry, the reviewing court must consider "whether the Secretary properly construed his authority to approve the use of [a protected site] as limited to situations where there are no feasible alternative routes or where feasible alternative routes involve uniquely difficult problems," *Overton Park*, 401 U.S. at 416, and whether the Secretary

11

could have reasonably believed that no such alternatives existed. *Id.*

Second, the court must determine "that the actual choice made was 'not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* In regard to this second prong, the Supreme Court noted that "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." However, while this inquiry "is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

Third and last, the court must examine "whether the [agency's action] followed the necessary procedural requirements." *Id.* at 417. Plaintiffs' arguments in support of their motion center on this third prong. Plaintiffs assert that Defendants did not conduct a proper analysis under § 4(f) in that the Secretary failed to analyze whether there are feasible and prudent alternatives to the destruction of the bridge. In particular, Plaintiffs claim that the record is devoid of "a finding that the historic drawbridge cannot be repaired without impairing its historic integrity." Moving Brf. at 17. Plaintiffs further assert that it was inappropriate for the Secretary to undertake the "programmatic" § 4(f) analysis, which they describe as a "short cut," rather than to undertake a "full" 4(f) analysis. *See* Moving Brf. at 17.

As explained in 48 Fed. Reg. 38,135, this "programmatic" approach is a procedure to "simplify and streamline compliance with 4(f) requirements" for highway projects involving the replacement or rehabilitation of historic bridges. There are several requirements that must be met in order for this programmatic 4(f) evaluation to be applicable in a particular situation:

1. The bridge is to be replaced or rehabilitated with Federal funds.

> 2. The project will require the use of a historic bridge structure which is on or is eligible for listing on the National Register of Historic Places.
> 3. The bridge is not a National Historic Landmark.
> 4. The FHWA Division Administrator determines that the facts of the project match those set forth in the sections of this document labeled Alternatives, Findings, and Mitigation.
> 5. Agreement among the FHWA, the State Historic Preservation Officer (SHPO), and the Advisory Council on Historic Preservation (ACHP) has been reached through procedures pursuant to Section 106 of the NHPA

.
48 Fed. Reg. 38,139.  Here, Plaintiffs have failed to show that any of these applicability criteria have not been met.  To the contrary, the 2005 Nationwide Programmatic Section 4(f) Evaluation itself sets out each of these criteria and explains how each was met with respect to the Route 36 Bridge project.

Moreover, contrary to Plaintiffs claim that the record is devoid of "a finding that the historic drawbridge cannot be repaired without impairing its historic integrity," there are several instances in the record where just such a finding is made.  For example, as discussed in more detail above, the 1991 Value Engineering Evaluation examined the proposed rehabilitation of the existing bridge, but noted that replacement was a more prudent alternative.  At that time, SHPO determined that the proposed rehabilitation itself would have an "adverse effect" on the historical integrity of the existing Route 36 Bridge.  Def. Ex. 7 at 6.

In 1996, an Historic Bridge Alternatives Analysis was prepared examining five project alternatives for the existing bridge.  Def. Ex. 13.  These included: no build, minor rehabilitation, major rehabilitation, new bridge on new alignment and replacement on-line.  Each alternative was analyzed with respect to its ability to meet the project's needs, its impact on the historic bridge, and its cost.  The "minor rehabilitation" alternative had the least impact (other than "no build") on the historic structure, but it also least met the project's needs.  With respect to the

"major rehabilitation" alternative, it was noted that this alternative would have an adverse effect on the bridge's historical integrity. Specifically, the study found that because of "the removal of superstructure, mechanical and electrical components and alterations to the piers, this alternative will not maintain the historical integrity of the bridge." Def. Ex. 13 at. 24. This alternative similarly did not fully meet the needs of the project.

In 1999, the Feasibility Study Evaluation of Alternatives considered five alternatives in addition to "no build" that included both minor rehabilitation and major rehabilitation. Def. Ex. 15. Again, each alternative was analyzed with respect to its ability to meet the project's needs, its impact on the historic bridge, and its cost. Minor rehabilitation was again determined to have the least impact on the historical integrity of the bridge, but this alternative failed to fulfil many of the project's needs. The study found that the alternative of major rehabilitation would "not strictly maintain the historic integrity of the bridge and could therefore lead to an Adverse Effect." Def. Ex. 15 at 26. Ultimately, the study rejected these rehabilitation alternatives in favor of the alternative of replacing the existing bridge, as this alternative more fully met the project's needs.

The 2003 Feasibility Assessment Report similarly examined minor and major rehabilitation alternatives and their impact on historic resources. Overall, this analysis considered four alternatives in addition to the "no build" option as discussed in more detail above. The report found that the minor rehabilitation alternative had no impact on historic resources, but did not fulfil the needs of the project. Like earlier reports, this report found that the alternative of major rehabilitation would cause an adverse impact on the historical integrity of the existing bridge.

Last, in 2005 the FHWA and NJDOT submitted a Nationwide Programmatic Section 4(f) Evaluation with respect to the Route 36 Bridge. Def. Ex. 86. This report discussed the proposed project -- a new high level bridge on a new alignment -- and the report rejected as not feasible and prudent the alternatives of no build, build on new location without using old bridge or parkland, rehabilitation without affecting historic integrity (minor rehabilitation), and new high level fixed bridge on existing alignment. It is true, as Plaintiffs point out, that this report does not address the alternative of major rehabilitation. However, the omission does not appear to be based on the mere "assumption" -- as Plaintiffs characterize it -- that a major rehabilitation would affect the historical integrity of the existing bridge. Rather, as discussed above, several of the earlier reports reached this very conclusion, namely, that a major rehabilitation would adversely impact the historical integrity of the bridge.

Contrary to Plaintiffs' arguments, it appears that Defendants conducted a thorough and comprehensive analysis of the various alternatives for the Route 36 Bridge consistent with the requirements of Section 4(f). The Court finds, therefore, with respect to Plaintiffs' Section 4(f) claims, that Plaintiffs have not established a likelihood of success on the merits. Therefore, this factor weighs against granting preliminary injunctive relief.

B.  Plaintiffs Have Not Established Imminent Irreparable Harm

"Establishing a risk of irreparable harm is not enough [to warrant a preliminary injunction]. A plaintiff has the burden of proving a clear showing of immediate irreparable injury." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987); *see also Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 973 (3d Cir.1980) ("To support a preliminary injunction, the moving party must show harm that is both imminent and irreparable."). According to

15

defendants, destruction of the old bridge will not take place until May 2009.  Declaration of Richard Crum, Def. Ex. 55, at ¶ 21.  As the Court intends that the merits of this dispute will be decided long before such time, Plaintiffs have not established the existence of imminent irreparable harm to warrant preliminary relief.  This factor, therefore, weighs against the granting of preliminary injunctive relief.

D.  The Balance of the Relative Harms Weighs Against Injunctive Relief

The third factor in the preliminary injunction analysis requires a court to consider whether "the relative harm which will be visited upon the movant by the denial of injunctive relief is greater than that which will be sustained by the party against whom relief is sought." *Atlantic City Coin & Slot Serv. Co., Inc. v. IGT*, 14 F. Supp. 2d 644, 657 (D.N.J.1998); *see also Neo Gen Screening, Inc. v. TeleChem. Intern., Inc.*, 69 Fed. Appx. 550, 554 (3d Cir.2003).  The Court concludes that balance of the relative harms does not favor Plaintiffs, and, therefore, this factor weighs against the imposition of a preliminary injunction.

As noted above, Plaintiffs have not made a showing of immediate irreparable harm.  On the other hand, Defendants have shown that even a minor delay in the construction of the replacement bridge could result in the loss of one or more construction seasons, thereby delaying construction for a year a more.  Declaration of Richard Crum, Def. Ex. 55, at ¶¶ 21, 30.  As discussed further below in the discussion of the "public interest" prong of the preliminary injunction analysis, a delay such as this would increase the likelihood of hazards to the public as a result of the continuing deterioration of the bridge and the likelihood that the existing bridge would need to be closed before the new bridge is completed.  *Id.* at ¶ 31.  Also, a delay would result in a substantial escalation of the costs of the project.  *Id.*

16

E. The Public Interest Does Not Weigh in Favor of a Preliminary Injunction

The final equitable factor a court must consider is "the public interest in the grant or denial of the requested relief, if relevant." *Atlantic City Coin*, 14 F. Supp. 2d at 657. Plaintiffs argue, and the Court recognizes, that the preservation of historic resources for future generations is in the public interest. However, this must be balanced against the public safety issues implicated by the deteriorating condition of the bridge, and the Court considers these safety issues to be paramount.

The Route 36 Bridge is a vital link for citizens in its surrounding communities. Route 36, including the Route 36 Bridge, is listed by the New Jersey State Office of Emergency Management as one of Monmouth County's official evacuation routes. Crum Declaration at ¶ 16. The bridge is also used by emergency vehicles responding to incidents such as fires or medical emergencies. *See*, *e.g.*, *id.* at ¶ 15 (describing an incident in February 2007 in which emergency vehicles from nearby municipalities used existing Route 36 Bridge to respond to major fire in residential complex in Sea Bright). Clearly, as Defendants argue, there is a strong public interest in maintaining the Route 36 Bridge as a safe, reliable and functioning part of the area's infrastructure.

There can be no serious dispute that the existing bridge has many significant deficiencies, as discussed earlier, that threaten this interest. Dunne Decl. at ¶ 2. Further, it appears that safety issues resulting from the bridge's deficiencies will only continue to increase over time. For example, the load carrying capacity of the bridge has declined from 55 tons five years ago to 43 tons presently (the legal load of a truck is 40 tons), and will continue to decline. *Id.* at ¶¶ 4-5. It may become necessary at some point to restrict the weight of traffic that may use the bridge.

Additionally, the substructure continues to erode and is in such condition that a bridge collapse is a possibility in the event of a major storm. *Id.* at ¶ 6.

According to Defendants, the current construction schedule is an aggressive one and is designed to take the existing bridge out of service at the earliest possible time -- May 2009. Crum Decl. at ¶ 19. However, Defendants note that, given the present condition of the bridge, there is no guarantee that the State, despite its best efforts, will be able to keep the bridge open for vehicular traffic until that date. *Id.* at ¶ 26. In particular, Defendants point to the possibility that the bridge's drawbridge mechanism will fail entirely.[5] *Id.*, Dunne Decl. at ¶ 20. If that were to occur, the State may be required by the Coast Guard to keep the bridge in the open position until repairs are made so that marine traffic could pass unimpeded. Crum Decl. at ¶ 26, 27. Having the Route 36 Bridge out of service for any length of time could have a serious negative impact on the availability of emergency services and on the evacuation plans for communities around the bridge. Even in non-emergency situations, a "bridge jamming" situation with the bridge stuck open causes traffic backup and congestion within a 6-10 mile radius, and severely impacts almost a dozen municipalities. Dunn Decl. at ¶ 11.

Given these safety issues, an injunction that may delay the Route 36 Bridge project could have serious public safety consequences. Therefore, the Court finds that, on balance, the public interest weighs against granting preliminary injunctive relief sought by Plaintiffs.

---

[5]According to Defendants, the bridge mechanism is subject to "sticking" at times, with the bridge getting stuck in either the open or closed position for a period of time. Dunn Decl. at ¶ 9, 12. In 2006, the bridge became stuck in the open position seven separate times, requiring closure of the bridge anywhere from one to seventeen hours. There were four incidents of "sticking" in 2007.

**III.  Conclusion**

      For the reasons expressed above, Plaintiffs' motion for a preliminary injunction is denied.

An appropriate Order accompanies this Opinion.

                                          /s/ JOEL A. PISANO
                                          United States District Judge

Dated: February 20, 2008